1
2
3
4
5
6
7

8           **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   THAI CHENG,                          No. CIV S-07-2570-CMK

12              Plaintiff,

13        vs.                        <u>MEMORANDUM OPINION AND ORDER</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                Defendant.
16   _____/

17              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

18   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

19   Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

20   judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

21   before the court are plaintiff's motion for summary judgment (Doc. 16) and defendant's cross-

22   motion for summary judgment (Doc. 19).

23                      **I.  PROCEDURAL HISTORY**

24              Plaintiff applied for social security benefits on April 27, 2001.  In the application,

25   plaintiff claims that her disability began on January 1, 1999.  Plaintiff claims that her disability is

26   caused by a combination of chronic fatigue, low potassium, chest pain, difficulty breathing,

                                         1

stomach ache, headache, back, arm and leg pain, body ache, poor appetite, sleeping problems, depression, anxiety, stress, nightmares, hallucinations, suicidal, problems concentrating and thinking, and memory loss.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on October 17, 2002, before Administrative Law Judge ("ALJ") Barry Wesker.   In a November 25, 2002, decision, the ALJ concluded that Plaintiff was not disabled based on the following relevant findings:

    1.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

    2.    The claimant has an impairment or combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

    3.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

    4.    The undersigned finds the claimant's allegations regarding her physical and emotional limitations are not credible for the reasons set forth in the body of the decision.

    5.    The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

    6.    The claimant has the following residual functional capacity to perform light work.  She can perform 1 and 2 simple steps, but must avoid the public.

    7.    The claimant is unable to perform any of her past relevant work (20 CFR § 416.965).

    8.    The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 416.963).

    9.    The claimant is "unable to communicate in English" (20 CFR § 416.964).

    10.    The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 416.968).

    11.    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

/ / /

12.   Based on the vocational expert's testimony and the framework of Rule 202.16, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include work as Packing line assembler, D.O.T. number 753.687-038, SVP 2, light exertional work, there are 68,0000 jobs in California; Can filling machine operator, D.O.T. number 529.685-282, SVP 2, light work, there are 18,000 jobs in California; and Small part assembler, D.O.T. number 706.684-022, SVP 2, light, there are 68,000 jobs in California.

13.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)).

(Certified Administrative Record ("CAR") 16).

After the Appeals Council declined review on February 27, 2003, Plaintiff filed an appeal with this court, case number 03cv1012-KMJ.  The parties entered in to a stipulated remand, wherein the parties agreed that the ALJ was to "consider the opinion of Dr. Su, treating physician, as well as Dr. Greenleaf's opinion concerning peer contact.  The ALJ will also obtain additional evidence from a vocational expert if necessary." (CAR 310-11).

Pursuant to that stipulated remand order, a new administrative hearing was held on July 19, 2005, before ALJ Wesker.  In a September 27, 2005, decision, the ALJ concluded again that Plaintiff is not disabled based on the following relevant findings:

1.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.   The claimant's dysthymia and mild degenerative arthritis are considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(c).

3.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.   The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.   The claimant has the residual functional capacity to perform "light" work involving one- or 2-step instructions, criticism from supervisors, and concentration at an adequate pace on simple tasks, but she cannot handle significant public contact.

6.   The claimant has no past relevant work (20 CFR § 416.965).

7.   The claimant is a 'younger individual' (20 CFR § 416.963).

8.      The claimant is 'unable to communicate in English' (20 CFR § 416.964).

9.      The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

10.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using the Medical-Vocational Guidelines as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include 3 unskilled (SVP2), light jobs: packing line assembler, DOT Code 753.687-038, of which there are 68,0000 jobs in California; can filling machine operator, DOT Code 529.685-282, of which there are 18,000 jobs in California; and small parts assembler, DOT Code 706.684-022, of which there are 68,000 jobs in California.

11.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

(CAR 275).

Following Plaintiff's appeal of that decision to the Appeals Council, on October 2, 2007, the Appeals Council issued a denial stating it found no reason to assume jurisdiction. This appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The CAR contains the following evidence, summarized chronologically below:

1.      Emergency/Outpatient Record, Sutter Health, May 14, 1999 (CAR 141-45);

2.      Hospital Records, Sutter Health, from June 25, 1999 through June 29, 1999 (CAR 146-80);

3.      Internal Medicine Consultative Examination, James L. Martin, M.D., June 19, 2001 (CAR 181-83);

4.      Psychiatric Evaluation, Stephen M. Greenleaf, M.D., July 10, 2001 (CAR 184-88);

5.      Residual Functional Capacity Assessment (RFC) - Mental, DDS physician, July 18, 2001 (CAR 189-92);

6.      Medical Records, We Care Medical Center, April 21, 2001 through September 11, 2001 (CAR 193-200);

7.      Psychiatric Review Technique Form, DDS physician, November 21, 2001 (CAR 201-15);

8.      Medical Records, Sacramento County Mental Health Treatment Center, November 5, 2001 through April 22, 2002 (CAR 216-27);

9.      Medical Records, We Care Medical Center, December 5, 2001 through June 19, 2002 (CAR 228-37);

10.     Medical Records, Adult Psychiatric Support Services, December 10, 2001 through June 17, 2002 (CAR 238-52);

11.     Medical Assessment of Ability to Do Work-Related Activities (physical) from Wu-Hsiung Su, M.D., May 15, 2002 (CAR 253-56);

12.     Psychological Evaluation, Barry Finkel, Ph. D., January 25, 2005 (CAR 426-33);

13.     Medical Records, Adult Psychiatric Support Services, July 31, 2002 through March 26, 2003 (CAR 434-43);

14.     Medical Records, Sacramento Community Health Center, October 20, 2004 through January 27, 2005 (CAR 444-49);

15.     Medical Records, Northgate Point RST, April 24, 2003 through June 16, 2005 (CAR 450-80);

16.     Psychiatric Review Technique Form, DDS physician, September 19, 2005 (CAR 481-94).

Treatment Records[1]

1999

Emergency room visit on May 14, 1999.  Plaintiff had low potassium levels but a normal chest x-ray.

On May 16, 1999, Plaintiff was brought to Sacramento County Mental Health Treatment Center pursuant to California Welfare and Institution Code 5150.  It was reported that Plaintiff was refusing to eat, drink or get out of bed, had lost a great deal of weight, and had been sad and depressed since an April 1999 abortion.  She complained of chest pain, poor sleep, weakness, and lack of appetite.  Her mood was slow, and she appeared to have difficulty with walking.  She was nervous and depressed.  She reported no auditory or visual hallucinations, no

---

[1]     The ALJ noted that most of Plaintiff's treatment records were largely illegible. The undersigned agrees.  The notes have been interpreted where possible.

suicidal ideation.  She had average intellectual functioning, and her insight and judgment were

fair.  She was diagnosed with Depressive Disorder NOS (psychosomatic), rule out adjustment

disorder with depressed mood.  She was discharged to her husband, and referred back to her

primary care physician.

She returned to in the emergency room on June 24, 1999, complaining of

abdominal pain.  An x-ray showed multiple gallstones and dilated common duct, with possible

obstruction.  She was admitted to the hospital and referred for a surgical consultation.  Surgery

was performed on June 25, 1999.  She was discharged on June 29, 1999.

2000

No medical records included.

2001

Plaintiff was seen on April 21, 2001, for back pain, headache and fatigue.  It was

noted that she had low potassium.  Dr. Su ordered x-rays of both her knees and neck, which were

taken April 23, 2001.  The knee x-ray showed "minimal medial articular marginal spurring of

each proximal tibia, without joint space narrowing."  The impression was "very minimal bilateral

medial degenerative spurring, otherwise normal." (CAR 198).  The cervical x-ray showed

"minimal dextroconcave cervical scoliosis without lordotic straightening.  The disc spaces,

neural foramina, visualized facets and bones are normal in appearance."  The impression was "no

significant abnormality evident." (CAR 198).  Plaintiff was also seen on May 19, 2001, June 30,

2001, July 28, 2001, and September 1, 2001.  These visits appear to have been for arthritis, URI,

and back pain, and possibly depression.  She was prescribed Tylenol, amoxicillin, and Celebrex.

On October 15, 2001, Plaintiff was evaluated at Sacramento County Mental

Health.  She reported depression and suicidal ideation.  She stated she cannot lift or carry

anything, but she can do a little gardening.  She admitted she has difficulties caring for herself,

and that her illnesses make it hard for her to work.  She stated she has suicidal ideation but denies

homicidal ideation or hallucinations.  She was found to have a depressed mood and affect, with

1   some lapses in remote past memories, but fair insight and judgment.  She was diagnosed with

2   Dysthymic Disorder and a global assessment function scale (GAF) of 55.

3           On December 5, 2001, Plaintiff was seen for headache, neck pain.  She reported

4   pain all over her body, but the physical exam was within normal limits.  She was assessed with

5   depression.

6           On December 10, 2001, she had initial intake evaluation at Sacramento County

7   Adult Mental Health Services APSS Clinic, Dr. Nguyen.  She reported trouble sleeping, eating,

8   concentrating, fatigue, and depression, which all began after her abortion.  She also reported

9   suicidal thoughts, recurring images of her friends' dead bodies she saw while fleeing Laos,

10  hearing voices like her deceased mother's, and occasionally seeing shadows of people.  Her

11  mood was dysphoric, attitude was cooperative, affect was appropriate, she was alert and appeared

12  oriented, and her insight and judgment were fair.  It was noted that she was having difficulty

13  adjusting to a new country with language barrier (having been in the United States for ten years),

14  and unemployment leading to financial issues, were contributing factors relating to her

15  depression.  She was diagnosed with Major Depressive Disorder, Recurrent, Severe, with

16  Psychotic Features; PTSD.  She was prescribed Remeron as an antidepressant.

17          On December 26, 2001, Plaintiff was seen for fatigue and diarrhea.  The progress

18  notes indicate a history of "? periodic paralysis."  The exam, however, was again within normal

19  limits.

20          2002

21          On January 9, 2002, Plaintiff saw Dr. Nguyen at Sacramento County Mental

22  Heath for follow up.  Renewed prescription for Remeron.

23          Plaintiff was seen for stomach pain on January 17, 2002.  The notes indicate a

24  complaint of weakness, but exam within normal limits.  She was again assessed with periodic

25  paralysis.

26  / / /

1   February 6, 2002, another follow up with Dr. Nguyen.  Doctor increased her

2   prescription for Remeron and added a prescription of Seroquel.

3   On February 18, 2002, she was seen for upper respiratory infection.

4   Saw Dr. Nguyen on March 19, 2002, but the notes are largely illegible.

5   Blood test report on March 26, 2002, showed potassium levels within normal

6   range.

7   Follow up with Dr. Nguyen on May 7, 2002.  Dr. Nguyen noted improved

8   depression and PTSD.  Renewed prescriptions.

9   Plaintiff was seen on May 15, 2002, and June 19, 2002, for headache, stomach

10  ache, ulcer.  However, the progress notes are illegible.

11  On June 17, 2002, Plaintiff saw Dr. Nguyen for follow up.  Dr. Nguyen noted

12  improved mood, sleep.  Continued prescriptions.

13  July 3, 2002, follow up with Dr. Nguyen.  Notes largely illegible, but indicate

14  continued PTSD symptoms.

15  Follow up with Dr. Nguyen on September 9, 2002.  Notes largely illegible, but

16  appears to note improvement in depression and PTSD.

17  <u>2003</u>

18  Plaintiff had follow up visit with Dr. Nguyen on February 4, 2003.  The notes are

19  again largely illegible, but appear to indicate her PTSD is stable, prescriptions renewed.

20  However, on February 6, 2003, the progress notes state Plaintiff was being referred to higher

21  level of care based on her current symptoms of hearing voices, nightmares, somatic complaint,

22  depression, sense of worthlessness, trouble eating, sleeping and concentration.

23  On June 13, 2003, Plaintiff was seen at Northgate Point RST, for her initial

24  psychiatric evaluation.  Her primary diagnosis was major depression, recurrent, with psychotic

25  features, also diagnosed with Post Traumatic Stress Disorder.  She appeared with depressed

26  mood and affect, and it was noted she had auditory and visual hallucinations, with occasional

suicidal ideation, but no intent or plan.  Her medications were reviewed and modified, including a new prescription for Effexor and Trazadone.

Follow up at Northgate Point RST on October 1, 2003.  Complaints about headaches.  Reported the Effexor helps some days, but complained of body aches and pains. Auditory hallucinations were reported to be about the same.  Plaintiff was questioned about the auditory hallucinations, but continued to perseverate on her pains.  Her mood was dysphoric, affect congruent, mildly blunted.  Her prescription for Effexor was increased to target depression, psychotic features which were expected to improve, as well as somatic complaints.

On December 30, 2003, Plaintiff was seen for URI, headache, depression and insomnia.  She was prescribed Amoxicillin and Tylenol.

2004

Follow up at Northgate Point RST on March 24, 2004.  Plaintiff reported she is the same, but that the headaches may be less intense and the depression a little better.  Reported nightmares twice a week, every other week, and auditory hallucinations two to three times a week.  Medications make her a little dazed, but no other side effects.  Her mood was dysphoric, affect congruent, mildly blunted, ranged to near-tears when discussing thoughts of not wanting to be alive.  Medications adjusted, increased Effexor again.

On August 31, 2004, had another follow up at Northgate Point RST.  She reported the medications are helping her feel better, with no side effects, but was still having nightmares every couple of nights, dreaming about her past in Laos.  Her auditory hallucinations continue. Her mood was "doing better," affect congruent, mildly blunted.  Medications continued, with increase in Seroquel.

Plaintiff was seen on October 20, 2004, for cough, low back pain, headache and fatigue.  However, the notes are illegible.

Follow up with Northgate Point RST on November 29, 2004.  Plaintiff reported she was about the same.  She continues to have headaches and nightmares, disturbed sleep, and

auditory hallucinations.  Mental status examination notes no psychomotor agitation, mild

retardation.  Her mood was depressed, affect congruent, mildly blunted.  Medications continued.

Seen on December 30, 2004, for chronic headache, shoulder pain, and back pain.

The notes indicate headaches, anxiety, insomnia, dizziness, and musculoskeletal symptoms.

2005

Blood test from January 7, 2005, shows potassium levels low, but within normal

range.

Follow up at Northgate Point RST on March 1, 2005, revealed that plaintiff was

without medication since November due to delivery problems.  As a result, her depression, pain

and sleep have all worsened.  Mental Status Examination notes no psychomotor agitation or

retardation.  Her mood was depressed, affect congruent, mildly blunted.  Medications were

updated and restarted.

Follow up at Northgate Point RST on June 16, 2005.  Receiving medications now,

but reported she feels the same as when she wasn't taking any medication.  Problems initiating

sleep, nightmares, and waking up continue.  Also continuing to have headaches, other aches and

pains.  Was given Tylenol #3 by physician, but not helping completely.  Mental Status

Examination notes moderate psychomotor retardation.  Her mood was depressed, affect

congruent, blunted.  Her assessment included "[r]estarting medications has not (reportedly)

resulted in any improvement of her sxs." (CAR 450).  Antidepressant changed from Effexor to

Prozac; for PTSD, Seroquel was decreased and Clonidine started.

Evaluations

James L. Martin, M.D., Internal Medicine Consultative Examination

Exam took place on June 9, 2001.  Plaintiff's chief complaint was whole body

pain.  She reported ongoing problems with diffuse body pain and weakness, constant headaches,

chest pain and fatigue since 1999.  Her medication included acetaminophen for aches and pains,

meclizine for dizziness, potassium chloride, propanolol, and triamterene-HCTZ.  Upon physical

10

examination, she appeared somewhat dysthymic, but had no obvious difficulty moving about the clinic and used no assistive devices.  Her cooperation was fair with no grimacing or pain vocalized.  She had full movement of cervical and dorsolumbar spine, was able to squat and arise without obvious difficulty.  There was no obvious muscular asymmetry or atrophy, but minimal degenerative changes was noted in the fingers.  Her gait was grossly normal, and she was able to walk on her heels and toes.  Motor tone was grossly normal.  Her grip strength was 5/5 bilaterally, reflexes were within normal limits.

Dr. Martin's assessment was "1.  Multiple somatic complaints with unremarkable examination;  2.  History of hypokalemia of unknown etiology, resolved by report;  3. Psychological problems not otherwise specified; 4. Degenerative arthritis, mild." (CAR 183). Dr. Martin concluded that

> [w]hile profound and/or persistent hypokalemia could cause a myriad of symptoms, it is not clear that presently her serum potassium levels are abnormal.  Based on the objective findings and available information at the time of this examination, I find no functional restrictions attributable to medical conditions. Psychological consultation would seem appropriate. (CAR 183).

Stephen M. Greenleaf, M.D., Consultative Psychiatric Evaluation

Consultative exam occurred July 10, 2001.  Dr. Greenleaf reviewed Plaintiff's psychiatric records and Social Security forms.  Her chief complaint was depression.  She reported she never recovered from her 1999 abortion, resulting in severe fatigue and musculoskeletal aches and pains ever since.  She stated she has trouble with memory, attention, concentration, sleep, and appetite, and has felt suicidal in the past.  She denied receiving psychiatric care at that time.  Dr. Greenleaf noted that Plaintiff had experienced exposure to the war and saw deaths, including two of her uncles.  She is capable of dressing and bathing herself, but did little else. On mental status examination, Dr. Greenleaf noted mild psychomotor retardation, fair eye contact and rapport, and good cooperation.  There was no evidence of homicidal or suicidal ideation, hallucinations or delusions.  Her affect was moderately depressed.  Her diagnosis was

11

depressive disorder not otherwise specified, moderate.  Her current GAF was 55; highest in the past year was also 55.

Dr. Greenleaf's assessment was that Plaintiff "has both physical and psychosocial stressors and says she is depressed.  Mental status exam today shows affective and neurovegetative signs of a mild to moderate depression with moderate cognitive deficits." (CAR 187).  He opined that Plaintiff is able to follow simple one and two-step commands, can function in an environment with little peer or public contact, can tolerate reasonable and constructive criticism, has the ability to get to work promptly and regularly, can work with adequate pace and persistence, and can follow simple safety rules.  Her prognosis was fair with appropriate psychiatric care.

<u>Mental Residual Functional Capacity Assessment (DDS physician)</u>

Non-examining review on July 18, 2001, found Plaintiff not significantly limited in most areas.  She was moderately limited in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to interact appropriately with the general public.  Notes indicate she may not be able to follow and carry out detailed instructions, might have difficulty with interaction, but has the ability to perform simple, routine, repetitive tasks with limited public contact.

<u>Wu-Hsiung Su, M.D., Medical Assessment of Ability to do Work-Related Activities (Physical)</u>

Plaintiff's treating physician, Dr. Su, We Care Medical Center, completed an evaluation of Plaintiff on May 15, 2002.  Dr. Su noted Plaintiff's principal diagnosis as periodic paralysis, and secondary diagnosis as major depression.  The basis of the diagnosis was stated as lab, physical.  The onset date was noted for the same day, May 15, 2002.  In Dr. Su's opinion, Plaintiff's ability to walk, stand and sit are affected by her impairments.  The medical findings supporting the assessment were noted as weakness, lower serum potassium, depression.  Dr. Su opined Plaintiff could walk, stand and sit less than one hour without interruption, for a total of one to two hours per day.  Due to her weakness and lower potassium, her ability to lift or carry

objects were affected so that she could only occasionally lift and/or carry up to ten pounds but never more.  She would be totally restricted in climbing stairs or ladders, bending, and would require rest periods during the day.  Due to weakness and depression, Dr. Su opined that Plaintiff is not capable of performing at least the full range of sedentary work, nor would she be able to work an eight-hour day five days per week.  She experiences severe pain, which Dr. Su opined as credible based on "clinical relevant."  Dr. Su did not expect improvement in Plaintiff's condition.

<u>Barry N. Finkel, Ph.D., Consultative Psychiatric Examination</u>

Disability evaluation completed on January 25, 2005.  Dr. Finkel reviewed the Social Security and medical records.  Plaintiff reported chronic pain in her head, neck, shoulders, hands, knees, chest, and back that began about five years prior, secondary to a motor vehicle accident.  Dr. Finkel set forth the following summary of her mental status:

> Gait is slowed.  General psychomotor activity is within normal limits.  <u>Orientation:</u> The claimant did not know the year, month, or day of the week.  <u>Memory:</u> She did not know her address, telephone number, or Social Security number.  She was not able to repeat two digits forward.  <u>Information:</u> Asked to name three large cities in California, she said she did not know.  She indicated that she is currently living in Sacramento.  She did not know the president of the US.  She did not know the number of days in a week.  <u>Similarities:</u> She was unable to abstract a dog and a lion or an orange and a banana, saying she did not know.  <u>Mathematics:</u> Asked to add 1+1, she said she did not know.  Asked to count 1+1 on her fingers, she said 3.  <u>Judgment:</u> Asked about smoke and fire, she said she did not know.  If she saw an envelope on the street that was sealed, addressed, and stamped?  She said she did not know. (CAR 427).

Plaintiff denied delusions, hallucinations, or ideas of reference.  There was no indications of psychotic symptoms.  Her mood was dysphoric with restricted range of affect.  Dr. Finkel determined that the test results he obtained were not considered valid due to Plaintiff's inadequate effort.  She showed no nonverbal indicators of pain and did not appear to be in significant subjective distress.  He noted that previous reports relate the onset of Plaintiff's somatic symptoms and depression to an abortion in 1999, but to him she dates her problems also to a motor vehicle accident.  "She reports depression with neurovegetative signs secondary to

13

chronic pain.  Medical findings do not appear to be consistent with the claimant's report of pain."

(CAR 429).  His diagnostic impression was Shenjing Shuairuo, with GAF of 62.  He explained

that the

> [r]ecords and current evaluation would appear to be most
> consistent with a diagnosis of Shenjing Shuairuo.  This is an Asian
> version of neurasthenia.  This is a condition characterized by
> physical and mental fatigue, dizziness, headaches and other pains,
> concentration difficulty, sleep disturbance, and memory loss.  It is
> noted that the claimant was able to provide an adequate history and
> a reasonably detailed report of medical and psychiatric problems.
> This was incongruent with performance on the mental status exam
> and during testing. (CAR 429).

Dr. Finkel further found Plaintiff capable of following simple instructions in

Hmong, able to attend to and follow through on simple tasks without direct supervision, and

interact appropriately with others.  But he found her attention, concentration, and pace could not

be reliably assessed.

<u>Psychiatric Review Technique (DDS physician)</u>

Review from January 1, 1999 through September 19, 2005, found no medically

determinable impairment, dysthymia but functional.  Plaintiff was found to have loss of interest

in almost all activities, psychomotor agitation or retardation, and decreased energy.  Her disorder

was noted at "Dysthymia (chronic low grade depression)." (CAR 484).  Plaintiff was found to be

moderately limited in her activities of daily living, maintaining social functioning, and

maintaining concentration, persistence, or pace.  Noted her GAF ranged from 55 to 62.

<u>Hearing Testimony</u>

Two administrative hearings were conducted.  The first on October 17, 2002, the

second on July 19, 2005.  Plaintiff testified at both hearings though an interpreter.  At the first

hearing, vocational expert Susan Clavell also testified.  At the second hearing, Dr. Sidney Walter

testified as a medical expert, and Steven R. Russell testified as a vocational expert.

/ / /

/ / /

1        <u>Plaintiff's 2002 Testimony</u>

2        Plaintiff testified she did not know her date of birth or how old she was, but

3   affirmed her birth date and age when provided.  She had no schooling in Laos or the United

4   States.  She has ten children.  She worked as a farmer in Laos, as did her husband.  She has not

5   worked in the United States, but her husband is working as a landscaper.  Plaintiff does not work

6   because of sickness, her body turned weak after her abortion in April 1999.  She had the abortion

7   because she had too many kids and was getting too old.  She feels that she is too weak to lift

8   anything, has to walk slowly.  She takes potassium to help with her weakness, and the doctor

9   prescribed a cane for her to use.  It is very hard for her to walk without the cane.  She can walk

10  around the house and a little bit outside with her cane, and can stand for five minutes at most

11  with the help of her cane.  She spent a night in the hospital a year before, and is now seeing a

12  psychiatrist, Adult Psychiatric Support Services, Sacramento County Mental Health.  She is

13  seeing the psychiatrist because has depression and can't sleep.  She feels very sad, cries and feels

14  that her whole body is weak.  She eats what is given to her, but earlier was refusing to eat to hurt

15  herself.  She has thought about killing herself, by hanging, but has not actually tried it yet.  She

16  has those thoughts because she cannot do anything to help her children and it makes her very sad.

17  She did not know how tall she was, but stated she weighed around 95 or 100 pounds.  Her older

18  children are bigger than she is, but she cannot do anything to help, like cook.  Her youngest child

19  was six years old.  Her older son takes care of the youngest.  The older children help cook.  She

20  does not think she could take care of the youngest by herself.  She is most sad about having kids

21  she cannot even cook for or take care of, and being a burden who depends on her kids.  Her

22  children are all healthy, go to school, speak English.  Her husband is working.  She is glad about

23  all of that.  She is sad that she cannot do anything to help her kids, that she has to suffer like she

24  does, and her kids have a mother who cannot do anything.  She used to be a good housewife who

25  took care of her husband.  Now her husband takes care of her.  All she does is just sit in the

26  house, lay down, crawl back and forth.

1         She testified she first came to the United States in 1989 or 1990.  She stated she

2   would work if she was not sick and was able to work.  Her neck, head and lack of sleep is what

3   bothers her the most.  She also has diarrhea.  When she tries to lay down her neck hurts and she

4   gets a headache and hears a noise in her ear.  She also has bad dreams where she "sees my

5   mother, father and dead people come to me." (CAR 44).  She sees her dead friends lying rotting

6   on the ground every time she closes her eyes to sleep.  She also hears voices calling her name.

7   When she hears the voices and opens her eyes, she can sometime see a shadow, like a ghost, but

8   when she looks closely she can see nothing.  She feels scared when airplanes fly over, it makes

9   her body shake and heart beat.  Loud noises in the house and fire crackers that are close also

10  bother her.[2]  She attempted to hang herself once, but was found before she did it.

11        <u>Plaintiff's 2005 Testimony</u>

12        Plaintiff testified that since the last hearing, things have not gotten better.  She

13  continues to see the same doctors.  She continues to have a lot of pain in her back, neck and

14  head, a lot of headaches.  Her depression has not gotten any better.  "How could it get better

15  when you get sicker every day from lack of everything." (CAR 509).  She has to depend a lot on

16  her children.  She takes her medication like she is supposed to, they are put in a box and she

17  follows the instructions.  She does not go anywhere; no grocery shopping, no entertainment.  She

18  goes to the doctor and back home.  She sleeps all day, but not well.  She has a lot of pain in her

19  shoulder and a lot of thinking so she can't fall asleep.  She would like to die because she has too

20  much illness, it would be better.  She is not sure if her medications help.  Sometimes they seem

21  to, other times it feels like they do nothing.  Not happy often, too much stress too often.  The

22  illness causes her stress.

23  / / /

---

25      [2]    Plaintiff's attorney was attempting to question her regarding Post Traumatic
    Stress Disorder, but the ALJ stated  "Not there.  No way to make it." (CAR 45).  The ALJ said it
26  was a little far-fetched, and at best she can claim depression over her experience due to the
    extended time period.

1                    Vocational Expert 2002 Testimony

2                    At the 2002 hearing, the ALJ called Susan Clavell to testify as a vocational expert

3    (VE).  The ALJ proposed the following hypothetical for the VE:

4              I'd like you to assume the claimant's age, education, and work
               background as she's testified and as the record reflects.  I'd like
5              you to further assume that the claimant suffers from some
               depressive effects which limit her in the following way.  And this
6              is within the frame of reference of her being able to handle light
               work as that term is described in our - - on a physical basis as that
7              term is described in our regulations.  She can do simple one-or
               two-step work.  She can, however, not function in a situation
8              where she'd have to have significant public contact.  She would
               need to be in a job where she wouldn't have much contact and she
9              could take constructive criticism from supervisors.  And would be
               able to concentrate and work with adequate pace on any simple
10             task that she would be assigned within reasonable parameters. . . .
               You are, of course, to factor in the fact that she is illiterate in the
11             English language and does not speak English. (CAR 48).

12                   The VE responded that she could identify unskilled assembly type jobs, both light

13   and sedentary.  The three she named were: Packing line assembler, light and unskilled, with over

14   21,000 positions in California, DOT number 753.687-038; Can filling machine operator, light

15   and unskilled, with over 18,000 positions in California, DOT number 529.685-282; and Small

16   parts assembly, light and unskilled, with over 68,000 positions in California, DOT number

17   706.684-022.

18                   The ALJ then amended the hypothetical to assume the claimant could not get to

19   work on a regular basis and would miss two or three days a month because of depression, and the

20   VE testified that would erode all of those jobs.  She also testified that "there are people that do

21   these jobs that don't speak English." (CAR 50).  No math skills would be required, the worker

22   would learn by demonstration.  Plaintiff's attorney then questioned the VE about the requirement

23   in the DOT regarding English.  She testified that there is no lack of English in the DOT.  The

24   jobs she identified were likely at a level one, but she had not looked them up.  Level one means

25   reading, recognizing meaning of 2,500 words, writing, print simple sentences, speaking simple

26   sentences.  Each of the jobs identified were assembly line type, which would require a worker to

1   maintain a reasonable pace, as set by the employer.  Such a worker could take unscheduled

2   breaks so long as they also kept up with their production requirements.

3   <u>Medical Expert 2005 Testimony</u>

4   At the second hearing, the ALJ called Dr. Sidney Walter to testify as a medical

5   expert (ME).  Prior to the hearing, Dr. Walter reviewed Dr. Finkel's consultative examination

6   report, including the diagnosis of Shenjing Shuairuo, with a GAF of 62.  In response, Dr. Walter

7   testified that the

diagnosis he gave is really what Americans would say is
[neurasthenia] which is really a functional weakness overall.  I
would feel that that particular examination indicated the Claimant
does not want to be productive, is unmotivated to be productive,
and that's the major problem with that particular - - what I glean
from that particular report.  In fact, there's some deliberate
exaggerations such as one plus one equals three, when later in
another report she was able to count and add numbers.  She
couldn't report - - repeat two digits forward.  That's an
exaggeration also because she was able to do that in other reports,
as well as this particular report when she was able to follow simple
commands.  I would say that overall in Dr. [Finkel]'s report the
Claimant was exaggerating her status in response to a question.  A
GAF of 62 is more of a guess rather than an accurate measurement
because her responses were not valid.  So I would say that's a
guess, 62. (CAR 500).

Dr. Walter further testified that a GAF of

55 is a serious impairment to overall functioning.  They can
function, but there's an impairment.  60 indicates they can
function, but there's some impairments involved.  I'd say her major
impairment seems to be her language, her culture, and dysthymia is
apparent.  That means she has a chronic low grade type of
depression which would interfere somewhat with being productive
in most areas of work.  It would be slow - - her productivity would
be slower and she would have some problems with complex
activities.  In Dr. Greenleaf's report he said she could follow three-
step commands accurately and efficiently, can count simple
numbers, can register three words without difficulty.  Which
contradicts her behavior in Dr. [Finkel]'s report.  He also gave a 55
which means that she has a severe impairment but not precluded
from work.  I believe she could do simple tasks. (CAR 502).

///

18

1        In response to Dr. Greenleaf's limitation of "little peer or public contact." Dr.

2  Walter testified "I don't find any major problem with contact with others, in the other reports

3  I've read.  I could see it would be a cultural problem if she were working in an environment

4  which was all English speaking." (CAR 502-03).

5        Finally, Dr. Walter testified that he does not note anything in the record like

6  periodic paralysis.  Major depression similarly is not supported, rather chronic low grade

7  depression, dysthymia, and weakness.  The ALJ then took administrative notice to the fact that

8  the lack of potassium in the system would cause tiredness and weakness.

9  <u>Vocational Expert Steven R. Russell 2005 Testimony</u>

10        VE Russell reviewed the record and heard Dr. Walter's testimony prior to

11  testifying.  He was not at the last hearing.  The ALJ set forth the same basic hypothetical he

12  provided the VE at the previous hearing, specifically:

13             assume Claimant's age, education, work background or as she's
                  testified in the record reflects [INAUDIBLE].  Further assume
14             Claimant suffers from depressive effects which limit her in the
                  following way.  Within the frame of reference of her being able to
15             handle light work as that term is described she can do one- or two-
                  step work.  She cannot function in a situation where she'd have to
16             have significant public contact.  I'm allowing for what Dr.
                  Greenleaf says. . . . She would need to be in a job where she
17             wouldn't have much contact with the public, and she could take
                  instructive criticism from supervisors.  And would be able to
18             concentrate and work on any simple task that she would be
                  assigned within reasonable parameters. . . . (CAR 504).

19

20        In response, VE Russell testified the packing line assembler, light and unskilled,

21  573.687-038 would meet those parameters in terms of little significant public contact, dealing

22  with supervisors' constructive criticism.  The can filling machine operator, 529.685-282, and

23  small parts assembly, 706.684-022, would also both meet the criteria in both counts.  The fact

24  that she doesn't speak English and is illiterate was then addressed, and the VE stated that he

25  agreed that the jobs available can be taught by gesture and demonstration.  In regards to peer

26  contact, the VE testified the three jobs identified would require Plaintiff to work "side by side"

with peers, so there may be "limited contact but nothing significant." (CAR 505).  As these

positions are in a factory type setting, there could be a moderate to large number of individuals in

the same proximity, especially for the packing line assembler and can filling machine operator.

The small parts assembly position could be on a very small setting, so it would depend on the

placement.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is:

(1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

(9th Cir. 1996).  It is "such evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including

both the evidence that supports and detracts from the Commissioner's conclusion, must be

considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v.

Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

findings, or if there is conflicting evidence supporting a particular finding, the finding of the

Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

Therefore, where the evidence is susceptible to more than one rational interpretation, one of

which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

Cir. 1988).

/ / /

/ / /

## IV.  DISCUSSION

Plaintiff argues the ALJ erred in three ways: (1) failure to properly evaluate and credit her treating physician and examining physician's opinions; (2) failure to credit Plaintiff's testimony regarding her pain, depression, fatigue and functional limitations; and (3) failure to properly assess Plaintiff's RFC resulting in an inadequate hypothetical to the VE.

### A.     MEDICAL OPINIONS

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

1   finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

2   legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

3   professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

4   without other evidence, is insufficient to reject the opinion of a treating or examining

5   professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

6   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

7   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

8   see also Magallanes, 881 F.2d at 751.

9          The opinions at issue here are those of Drs. Su and Greenleaf.  In his 2005

10   opinion, the ALJ stated:

11          the undersigned cannot credit Dr. Su's medical source statement
            finding the claimant unable to perform even sedentary exertion.
12          The primary diagnosis offered by Dr. Su is "periodic paralysis."
            However, aside from two chart note entries (based on the
13          claimant's subjective complaints) there is no further mention of
            this subjective complaint in the medical records and, in any event,
14          there are no objective findings, treatment records, or other clinical
            support for a disorder involving paralysis; thus, Dr. Su's very
15          restrictive assessment cannot be credited. (CAR 573).

16          Plaintiff argues Dr. Su's opinion as to Plaintiff's limitations is supported by her

17   own medical records, as well as the record as a whole, including Dr. Su's citation to Plaintiff's

18   weakness, low potassium, and depression.

19          While the ALJ was required to consider Dr. Su's opinion as a treating physician, it

20   is not an uncontradicted opinion.  Instead, as the ALJ discussed, there was a consultative

21   examination in June 2001 in which the examiner found no functional restrictions.  This opinion

22   was rendered based on different independent clinical findings and was specifically referenced in

23   the ALJ's decision.  Therefore, the ALJ was only required to resolve the conflict between the

24   treating and examining physician's opinions, which he did.  See Andrews, 53 F.3d at 1041.  The

25   ALJ even set forth specific reasons for doing so, stating that there was no support in the record

26   for Dr. Su's very restrictive assessment.  In addition, although the consultative examiner found

1  no functional restrictions, the ALJ gave the benefit of any possible doubt to Plaintiff and limited

2  her abilities to a light RFC.

3           As to Dr. Greenleaf's opinion, the ALJ specifically stated that:

4          [i]n compliance with the remand order the undersigned has
           considered the medical source statement of Dr. Greenleaf in

5          arriving at the claimant's residual functional capacity and has given
           it considerable weight regarding "little peer or public contact."

6          (CAR 273).

7           Plaintiff argues that while the ALJ gave lip service to Dr. Greenleaf's opinion, his

8  RFC does not support that claim.  Specifically the ALJ did not include those limitations.  She

9  argues Dr. Greenleaf's restriction regarding "little peer or public contact" is not the same as the

10  ALJ's RFC restriction that "she cannot handle significant public contact."

11           As discussed in more detail below, although the ALJ stated in his opinion that

12  Plaintiff is unable to handle significant public contact, and did not specifically address Dr.

13  Greenleaf's restriction regarding peer contact, the ALJ did take that restriction into consideration

14  when addressing whether there are any jobs in the national economy which Plaintiff could

15  handle.  Specifically, he addressed the issue with the vocational expert at the administrative

16  hearing.  In addition, he specifically stated in his opinion that "[t]he vocational expert testified

17  that the jobs enumerated required limited but not significant peer contact." (CAR 274).

18  Accordingly, the undersigned finds that the ALJ adequately accepted Dr. Greenleaf's limitations.

19           In addition, Plaintiff argues that the ALJ credited the testimony of Dr. Walter, the

20  ALJ's medical expert but not a treating or examining physician.  However, although the ALJ

21  credited Dr. Walter's opinion and testimony, he also credited the examining physicians opinions

22  which were in accord.  Specifically, Dr. Greenleaf opined that Plaintiff was able to follow simple

23  one and two-step commands, can function in an environment with little peer or public contact,

24  can tolerate reasonable and constructive criticism, has the ability to get to work promptly and

25  regularly, can work with adequate pace and persistence, and can follow simple safety rules.  Dr.

26  Martin found no physical functional restrictions.  Similarly, Dr. Walter opined Plaintiff's

productivity would be slower, she would have problems with complex activities but was capable of simple ones, and he did not see any problems with contact with others.  Indeed, while the ALJ credited Dr. Walter's opinion, his RFC was more restrictive than Dr. Walter's opinion, and more in line with Dr. Greenleaf.

Finally, Plaintiff argues Dr. Finkel's report is at odds with his RFC assessment, and the ALJ failed to discuss or reconcile the discrepancies.  The undersigned does not find any significant discrepancies between the two.  In his report, Dr. Finkel opined Plaintiff could follow simple instructions, attend to and follow through on simple tasks and interact appropriately with others.  In the RFC assessment, he marked the box for no restrictions in her ability to understand and remember short, simple instructions and only slight restriction in her ability to carry out short, simple instructions.  He did note she was moderately restricted in making judgments on simple work-related decisions, which is what Plaintiff points out.  However, restricting her ability in rendering judgment is not in conflict with the opinion that she can follow simple instructions.  In addition, although he does mark she is moderately restricted in her ability to interact appropriately with others, that is not necessarily in conflict with his statement that she can interact with others.  In addition, as the ALJ noted, Plaintiff's performance for Dr. Finkel was inadequate and indicated a poor effort.  He specifically addressed Dr. Finkel's exam stating:

> [d]uring January 2005 consultative psychological evaluation the claimant again related multiple somatic complaints and depression but there was no evidence of abnormal thought processes and her performance on the standardized tests was inadequate and indicated a poor effort.  The assessment was neurasthenia and that she was capable of handling simple instructions and tasks without direct supervision interact appropriately with others. (CAR 271).

The undersigned finds no error in the ALJ's treatment of the medical opinions.  Where there was conflict between the treating and examining physicians' opinions, the ALJ resolved the conflict appropriately.  He set forth specific and legitimate reasons for rejecting the treating physician's opinion, and that decision was supported by the examining physician's opinion, independent clinical findings, and the record as a whole.

**B.   CREDIBILITY**

Plaintiff argues the ALJ improperly discredited her testimony because he did not believe the medical evidence proved the alleged degree of her symptoms and functional limitations.  In addition she argues he improperly discredited third party statements regarding her abilities.

1.   Plaintiff's Credibility

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof.  Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom.  By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799

F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

As to Plaintiff's credibility, the ALJ stated:

> the claimant's allegations of severe pain and consequent inability for any level of functioning simply lack any reasonable support in the medical records and cannot be credited.  As noted above, gait, coordination, motor functioning, sensation, and reflexes have been reported as normal.  Radiological studies have shown only minimal degenerative findings.  The consulting physician did find some arthritic changes affecting the claimant's fingers and the x-rays showed spur formations of her cervical spine and knees.  These findings reasonably limit the claimant to "light" exertion, as defined herein and in the regulations.  Though neither the consulting examining internist nor the State Agency's reviewing medical source found any exertional limitations, the undersigned has accorded some weight to the claimant's arthritis in finding a "light" residual functional capacity. (CAR 272).

In addition, the ALJ found Plaintiff's

> various statements indicating her lack of ability for concentration sufficient to complete any task is inconsistent with her performance during the various psychological evaluations

indicating at least a fair ability and sufficient to perform at least simple tasks.  The third party statements from the claimant's husband asserting the claimant is essentially nonfunctional is obviously self serving, lacks any reasonable support, and is not credited.  The state agency's reviewing source was in agreement. Those assessments are given considerable weight in light of their considerable support from the record.  Further undermining her credibility is her obvious lack of cooperation, as noted above, during the consultative examinations.  In short, there is very little objective medical support for the claimant's multiple somatic complaints, which are not a reasonable consequence of her medically determinable impairment and thus are not credited, i.e., beyond those limitations reasonably resulting from her arthritis. (CAR 273).

Plaintiff argues the ALJ erroneously discredited her testimony because he did not believe the medical evidence proved the alleged degree of her symptoms and functional limitations.  However, as set forth above, the ALJ did more than simply dismiss Plaintiff's credibility due to a lack of medical evidence to support the degree of symptoms she reported.  He set forth  specific, cogent reasons for finding her testimony to be not credible.  He supported his decision by discussing the lack of symptoms on physical examination, lack of objective findings based on radiological studies, her inconsistent performance in evaluations, and her lack of cooperation.  These reasons are appropriate, supported by the record as a whole, and taken together are clear and convincing reasons for rejecting Plaintiff's testimony.  The court finds the process and reasons were proper, and defers to the Commissioner's discretion.

## 2.   Witness Credibility

In determining whether a claimant is disabled, an ALJ generally must consider lay witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

1   919.

2          Here, the ALJ did consider Plaintiff's husband's statements, and did not reject the

3   statements without comment.  He gave specific reasons why he found her husband's statements

4   not credible, including that not only were they self serving, but they lacked any reasonable

5   support.  Plaintiff argues any relative's statements could be considered self serving, and thus is

6   not a valid reason for reject the statements.  However, the ALJ also supported the rejection of her

7   husband's statement because they were unsupported, thus inconsistent with the record.  Such

8   reasoning is sufficient.  See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).

9          **C.    RESIDUAL FUNCTIONAL CAPACITY**

10          Residual functional capacity is what a person "can still do despite [the

11   individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

12   Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

13   "physical and mental capabilities").  Thus, residual functional capacity describes a person's

14   exertional capabilities in light of his or her limitations.

15          Hypothetical questions posed to a vocational expert must set out all the

16   substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

17   Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

18   limitations, the expert's testimony as to jobs in the national economy the claimant can perform

19   has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

20   the ALJ may pose to the expert a range of hypothetical questions based on alternate

21   interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

22   determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

23   Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

24          Here, Plaintiff argues the ALJ's RFC failed to include all of her limitations, and

25   therefore the hypothetical questions posed to the VE were incomplete.  She argues the ALJ

26   improperly rejected Dr. Su's opinion regarding her inability to perform even sedentary work as

well as her need for rest periods, Dr. Greenleaf's limitations as to peer and public contact, and the opinions of her mental health providers regarding the severity of her mental illness, as well as her own testimony.

The ALJ found Plaintiff "retains the residual functional capacity to perform 'light' work involving one- or 2-step instructions, criticisms from supervisors, and concentration at an adequate pace on simple tasks but cannot handle significant public contact." (CAR 273). Based on that RFC, he determined "she is capable of performing a significant range of light work as defined in 20 CFR § 416.967. (CAR 274). However, he further found that her "ability to perform all or substantially all of the requirements of light work is impeded by additional exertional and/or non-exertional limitations." (CAR 274). Therefore, he relied on the testimony of an impartial VE, who found she was capable of performing three different jobs which "required limited but not significant peer contact." (CAR 274).

Plaintiff first contends the RFC did not contain all of Plaintiff's limitations based on Dr. Su's opinion, her other mental health providers' notes, her own testimony and the supporting statements of her husband. As discussed above, the ALJ set forth sufficient reasons to reject Dr. Su's conclusory opinion, crediting the examining physicians' opinions, and finding both Plaintiff's and her husband's statements not credible. The RFC set forth in the opinion is supported by the record as a whole, based on the medical evidence and opinions set forth therein. Plaintiff's argument that the ALJ failed to include Dr. Greenleaf's limitations regarding peer and public contact is not supported by the record. At the second administrative hearing, the ALJ specifically addressed Plaintiff's need for limited peer and public contact, and incorporated that restriction  into the hypothetical question posed to the VE. He also addressed the issue of peer contact in his opinion, specifically noting "that the jobs enumerated required limited but not significant peer contact." (CAR 274). The undersigned finds the RFC set forth by the ALJ is supported by the record.

/ / /

1     As to the hypothetical posed to the VE, the undersigned also finds it to be

2 sufficient.  Plaintiff objects to the hypothetical posed as it failed to include the limitation to peer

3 and public contact.  However, the hypothetical posed to the VE at the second hearing specifically

4 noted that "[s]he would need to be in a job where she wouldn't have much contact with the

5 public, and she could take instructive criticism from supervisors." (CAR 504).   The VE testified

6 that all three possible jobs would meet that criteria.  He then asked "[h]ow much peer contact

7 would there be in these three jobs?" (CAR 505).  The VE replied that she would be working side

8 by side with others, and she may therefore "have limited contact but nothing significant." (CAR

9 505).  The VE also noted that in a factory type setting there could be a large number of people

10 around, but it depends on the placement.

11     The undersigned finds the hypothetical posed to the VE sufficient.  It incorporated

12 the limitations Dr. Greenleaf set forth, including her need to have limited peer and public contact.

13 Although the VE testified there may be a large number of people around in a factory setting, that

14 does not necessary mean there would be a significant amount of peer contact.  In addition, Dr.

15 Greenleaf's limitation was little peer or public contact, not that she could have no peer contact at

16 all.  As the VE testified that there would be limited but not a significant amount of contact, the

17 court finds that sufficient to support the ALJ's findings.

18     Finally, Plaintiff argues the ALJ failed to include other limitations, such as her

19 inability to communicate in English, and her need for rest breaks.  However, the undersigned

20 finds that the ALJ properly included those limitations in his discussion with the VE at the

21 hearing.  The ALJ specifically addressed those issues, and the VE testified that so long as she

22 was able to keep the pace, she could have rest breaks, and that there are a significant number of

23 individuals in these positions who did not speak English and that it was not a specific

24 requirement.  Both VEs noted communication could be accomplished based on visual

25 demonstration, and non-verbal communication.  Therefore, the court finds ALJ adequately

26 addressed all of Plaintiff's limitations in both the RFC and the hypothetical posed to the VE.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

      1.     Plaintiff's motion for summary judgment (Doc. 16) is denied;

      2.     Defendant's cross-motion for summary judgment (Doc. 19) is granted; and

      3.     The Clerk of the Court is directed to enter judgment and close this file.

DATED: March 23, 2010

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE